GRACIELA TENORIO,                    )
                                     )
            Plaintiff,               )        No. 17 C 03981
                                     )
    v.                               )
                                     )        Judge Edmond E. Chang
MICHAEL HARRIS and                   )
JAVON UPSHAW,                        )
                                     )
            Defendants.              )

## MEMORANDUM OPINION AND ORDER

In May 2015, Michael Harris and Javon Upshaw, then police officers for the Village of Robbins, visited Graciela Tenorio's tire shop to follow-up on a complaint that four tire rims displayed for sale at the stop were in fact rims that had been reported stolen several months ago. While the officers were at the shop, they handcuffed Tenorio and put her in a squad car for several minutes. Tenorio filed this civil-rights lawsuit under 42 U.S.C. § 1983, claiming that Harris and Tenorio seized her without probable cause in violation of her Fourth and Fourteenth Amendment rights.[1] R. 17, First Am. Compl. The officers move for summary judgment, arguing that they had probable cause to arrest Tenorio. R. 30-1, Defs. Mot. Summ. J. For the reasons explained below, summary judgment is granted.

---

[1]The Court has jurisdiction over this claim under 28 U.S.C. § 1331. Tenorio originally also brought claims against the Village of Robbins under *Monell* liability and indemnification theories. *See* R. 1, Compl. ¶¶ 27-32. Those claims were voluntarily dismissed on October 5, 2017. R. 16.

# I. Background

In deciding the Defendants' motion for summary judgment, the Court views the evidence in the light most favorable to Tenorio. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The incident at issue in this case occurred at Tenorio's business, the Highway Tire shop in Harvey, Illinois. R. 38, Defs. Resp. Pl. Statement Add. Facts ¶ 18.[2] On May 26, 2015, Harris visited the shop to follow up on a complaint filed on August 17, 2014 by a man named Ibrahim Ziadah. R. 35, Pl. Resp. DSOF ¶ 18; *see also* Defs. Resp. Pl. Statement Add. Facts ¶ 20.[3]

Ziadah had originally reported that three tire rims were stolen from his shop, including "one orange lip Ashanti rim, one white lip Ahsanti rim, and one non-brand white lip rim." Pl. Resp. DSOF ¶ 13. He estimated that the rims, in total, were worth around $10,000. *Id.* ¶ 14. Sometime after the original complaint was filed—Harris does not remember exactly when—Harris says that he followed up with Ziadah and clarified exactly what had been stolen. R. 31-1, Harris Dep. Tr. at 96:5-21. Ziadah told him then that four "big lip" rims had actually gone missing, and that they were custom painted an orange color. Pl. Resp. DSOF ¶¶ 16-17; Harris Dep. Tr. at 57:13-20, 96:5-21. He also provided photographs of the rims. Pl. Resp. DSOF ¶¶ 16-17;[4]

---

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

[3]Tenorio disputes that Harris conducted an "investigation" on May 26, 2015, apart from a phone call with Ziadah. Pl. Resp. DSOF ¶ 18. But Tenorio obviously does allege that Harris visited the shop that day. Defs. Resp. Pl. Statement Add. Facts ¶ 20.

[4]Tenorio disputes that Ziadah "showed" the pictures to Harris, arguing that this conversation took place via a cell phone call. Pl. Resp. DSOF ¶ 17. But Tenorio cites to Harris's deposition transcript at 53:15-23. Those lines are clearly about Harris's conversation with Ziadah on May 26, 2015, *see* Harris Dep. Tr. at 53:9-20, not the conversation that occurred sometime before that, *see id.* at 96:5-21. Either way, however, Tenorio does not

Harris Dep. Tr. at 57:3-9. On May 26, 2015, Ziadah called Harris's cell phone to tell him that his orange rims "were possibly on display" at Tenorio's shop. Pl. Resp. DSOF ¶ 19.

Harris visited Tenorio's shop that same day. *See* Pl. Resp. DSOF ¶¶ 19-22. On Harris's first visit there, he contends, he saw the rims that Ziadah had reported stolen. *Id*. ¶ 20; Harris Dep. Tr. at 57:21-23. Harris also spoke with Tenorio, who provided him with a copy of the ID of the person who sold her the tires, as well as other information about the sale. Defs. Resp. Pl. Statement Add. Facts ¶ 21 (stating that Tenorio provided Harris with a copy of the purchaser's ID the first time that Harris visited the shop); Harris Dep. Tr. at 61:18-23, 64:1-4 (acknowledging that the document offered by Tenorio reflected a copy of the seller's driver's license, and the amount that Tenorio paid for the tires). Harris then left Tenorio's shop. Pl. Resp. DSOF ¶ 22.

Later the same day, Harris returned to Tenorio's shop, this time with Upshaw. Pl. Resp. DSOF ¶ 22-24. Upshaw and Harris spoke to Tenorio about the rims, with the help of Tenorio's employee, Jose Andres Rocha, who provided some language-interpretation assistance between Spanish and English. *See* Defs. Resp. Pl. Statement Add. Facts ¶ 15; R. 31-4, Rocha Dep. Tr. at 19:19-20:21; Harris Dep. Tr. at 79:3-7; R. 31-2, Upshaw Dep. Tr. at 76:23-77:3.

The parties disagree about exactly what happened during this conversation. Harris and Upshaw both assert that Tenorio became angry, began walking back and

appear to dispute Harris's testimony that Ziadah provided photographs of the rims before May 26, 2015.

forth, and "bumped" or "pushed" Upshaw. DSOF ¶ 32 (citing Upshaw Dep. Tr. at 68:7-11, 71:1-2); DSOF ¶ 33 (citing Harris Dep. Tr. at 73:8-10). For her part, Tenorio "categorically denies" any physical contact with the officers. Pl. Resp. DSOF ¶¶ 32-33 (citing R. 37-5, Tenorio Aff. re: Events ¶ 3 ("At no point did I make any physical offensive contact with the officers, push them, or in any way resist them or pull away as they placed me in handcuffs.")); R. 37, Pl. Statement Add. Facts ¶ 36. Additionally, both Tenorio and Rocha have testified that Tenorio never began pacing back and forth, but simply asked for proof that the rims were stolen, and then was immediately handcuffed. *See* R. 31-3, Tenorio Dep. Tr. at 22:6-24, 23:1-24:4; Rocha Dep. Tr. at 14:21-17:21.

There is a video from outside of Tenorio's shop that depicts part of the encounter, but it does not include an angle showing the inside of the tire shop, where the parties spent around two minutes. *See* Pl. Statement Add. Facts, Exh. G at 17:56-17:58. By the time the parties walked out of the tire shop, Tenorio was already handcuffed. *Id.* at 17:58. On the outdoors footage, Tenorio does not appear to push or bump either of the officers. *Id.*

In any case, the parties agree that Tenorio was handcuffed and placed in the back of Upshaw's squad car. Pl. Resp. DSOF ¶¶ 36-37; Upshaw Dep. Tr. at 82:9-22; Rocha Dep. Tr. at 16:24-17:2. They disagree, however, on whether she "snatched" her hand away in the process. *Compare* DSOF ¶ 38 *with* Pl. Resp. DSOF ¶ 38. Tenorio was released at some point after other shop employees promised to return the tires. Upshaw Dep. Tr. at 84:2-14; Rocha Dep. at 18:23-19:3.

## II. Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[5] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

---

[5]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

## III. Analysis

Tenorio's false-arrest claim would ultimately require her to prove, at trial, that Harris and Upshaw had no probable cause for her arrest. *Hurt v. Wise*, 880 F.3d 831, 841 (7th Cir. 2018) ("A claim of false arrest is an allegation that a plaintiff was arrested without probable cause, in violation of the Fourth Amendment. Probable cause is an absolute defense to such a claim.") (cleaned up), *overruled on other grounds by Lewis v. City of Chi.*, 914 F.3d 472, 475 (7th Cir. 2019). As a result, if Harris and Upshaw can establish that there is no genuine dispute of material fact as to whether they had probable cause to arrest Tenorio, then they win.

Probable cause for an arrest "exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). "To determine whether an officer had probable cause for an arrest, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (cleaned up). Probable cause is not a high bar; it only requires a "probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). Probable cause may be based on information provided by a victim, as long as an officer "reasonably believes that the victim is telling the truth." *McBridge v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009).

Finally, so long as police officers *objectively* have probable cause to arrest a person for a crime, it does not matter what crime the officers *subjectively* believe the person has committed. *Devenpeck v. Alford*, 543 U.S. 146, 154-55 (2004).

In their motion, Harris and Upshaw argue that they had probable cause to arrest Tenorio for three different crimes: aggravated battery, resisting or obstructing a police officer, and receiving stolen property. Defs. Mot. Summ. J. at 6-9. Keeping in mind that the Defendants need only show they had indisputable probable cause for one crime to defeat the false-arrest claim, the Court will evaluate each possible crime in turn.

## A. Aggravated Battery

The question of whether Harris and Upshaw had probable cause to arrest Tenorio for aggravated battery hinges on one crucial, disputed fact: whether Tenorio made physical contact with either officer before they arrested her. Under Illinois law, "[a] person commits aggravated battery when, in committing a battery, … he or she knows the individual battered to be …a peace officer … performing his or her official duties." 720 ILCS 5/12-3.05(d)(4)(i). Battery, in turn, requires that the person "knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3. There are no facts to show, and the Defendants do not claim, that Tenorio caused bodily harm to either officer. So to establish probable cause for aggravated battery, they must, at a minimum, show that there is no factual

dispute that Tenorio touched one of them (leaving aside whether that touching was "of an insulting or provoking nature").

Harris and Upshaw both maintain that Tenorio bumped into Upshaw. DSOF ¶ 32 (citing Upshaw Dep. Tr. at 68:7-11 ("In the process of her walking back and forth, she ended up bumping me and Detective Harris, which physical contact was made."), 71:1-2 ("I don't recall how she did push, but she did make physical contact.")); DSOF ¶ 33 (citing Harris Dep. Tr. at 73:8-10 ('She pushed past him enough to touch him.")).

But Tenorio "categorically denies" the physical contact that Harris and Upshaw describe. Pl. Resp. DSOF ¶¶ 32-33 (citing Tenorio Aff. re: Events ¶ 3 ("At no point did I make any physical offensive contact with the officers, push them, or in any way resist them or pull away as they placed me in handcuffs."); Pl. Statement Add. Facts ¶ 36 ("Plaintiff never made any physical contact with any officer, pushed any officer, or in any way resisted the officers as she was placed in handcuffs.")). She also points to the depositions of herself and Rocha, in which they both lay out a slightly different timeline than the officers. In that alternative sequence of events, Tenorio never starts pacing back and forth—she just asks for proof that the rims were stolen, and then the officers immediately handcuff her. *See* Tenorio Dep. Tr. at 22:6-24, 23:1-24:4; Rocha Dep. Tr. at 14:21-17:21.

The only other evidence in the record besides the parties' and Rocha's accounts is the video recording from outside of Tenorio's body shop that she submitted. *See* Pl. Statement Add. Facts, Exh. G. In the video, Tenorio and the officers are shown talking with another man for a few minutes. During that time, Tenorio does not

appear to touch or bump anyone. Then, they all walk into the tire shop, out of sight from the video. *Id.* at 17:56. By the time they walk out of the tire shop again, Tenorio is already handcuffed. *Id.* at 17:58. The video provides no evidence that lends to an inference that Tenorio touched either officer.

The bottom line is that there is a genuine dispute of material fact. The Court cannot grant summary judgment on the premise that there was probable cause to arrest Tenorio for aggravated battery.

## B. Obstructing or Resisting a Peace Officer

Next is the obstruction possibility. Illinois law prohibits "knowingly resist[ing] or obstruct[ing] the performance by one known to the person to be a peace officer … of any authorized act within his or her official capacity." 720 ILCS 5/31-1. Liability under the statute requires a physical act. *People v. McCoy*, 881 N.E.2d 621, 630 (Ill. App. 2008) (explaining the statute prohibits "a physical act that impedes, hinders, interrupts, prevents, or delays the performance of the officer's duties, such as going limp, forcefully resisting arrest, or physically helping another party to avoid arrest."). "Merely arguing with a police officer—even using abusive language—does not constitute resisting a peace officer." *People v. Long*, 738 N.E.2d 216, 222 (Ill. App. 2000).

There is a substantial factual question on whether Tenorio committed the type of physical act that would be required for resisting a peace officer. Of course, as discussed above, Tenorio denies touching either officer. Pl. Resp. DSOF ¶¶ 32-33. But besides the battery the officers insist that Tenorio committed, they also both assert

that she "snatched her arm away" when Upshaw attempted to handcuff her. DSOF ¶ 38 ("When Commander Upshaw attempted to handcuff the plaintiff, she snatched her arm away.") (citing Upshaw Dep. Tr. at 79:15-24 ("[A]s I went to handcuff her, she pulled away from me. … She snatched away from me.")). Setting aside the question of whether that "snatch" would necessarily qualify as the requisite physical act,[6] Tenorio flatly denies having done it. Pl. Resp. DSOF ¶ 38 (citing Tenorio Aff. re: Events ¶ 4 ("At no point did I … in any way resist [the officers] or pull away as they placed me in handcuffs.")). And of course, no snatch appears on the video of the interaction—when the parties come back out of the shop and into the view of the camera, Tenorio is already in handcuffs. *See* Pl. Statement Add. Facts, Exh. G at 17:58.

So here too is a genuine dispute on whether Tenorio committed the sort of physical act that would give the officers probable cause to arrest her for obstruction. The Court cannot grant summary judgment on this basis.

---

[6]It is not clear that snatching one's hand away from a police officer constitutes resistance. In *People v. Flannigan*, the Illinois Appellate Court held that a defendant who jerked his arm away when the officer tried to lead him to the squad car had not committed the crime of resisting a peace officer. 267 N.E.2d 739, 742 (Ill. App. Ct. 1971) (calling the defendant's act "at most an insubstantial display of antagonism or belligerence" and reversing his conviction). Also, it is not clear whether something a suspect does *after* the officer has already decided to arrest her (which is when the alleged conduct in this case would have happened, because Upshaw was apparently trying to handcuff Tenorio at the time) can give the officer probable cause for an arrest already in progress. The Court need not decide either of these questions, however, given the dispute on whether Tenorio snatched her hand away at all.

## C. Theft – Receiving Stolen Property

### 1. Probable Cause

The officers' final—and best—argument is that they had probable cause to arrest Tenorio for theft. Under Illinois law, a person is guilty of theft when she "obtains control over stolen property knowing the property to have been stolen or under such circumstances as would reasonably induce … her to believe that the property was stolen." 720 ILCS 5/16-1(a)(4). This is not necessarily a traditional definition of theft, but rather closer to receiving stolen property, which is what this Opinion will call it. The question of whether the "circumstances" should lead the person to know the property was stolen is evaluated from the perspective of an ordinary person. *See People v. Nelson*, 784 N.E.2d 379, 382 (Ill. App. Ct. 2003) (upholding the defendant's conviction where he bought two electronic items on the street in the middle of the night at far less than their value, and the seller refused to give him a receipt: "Based on these facts, we believe that a person of ordinary intelligence presented with the [goods] under these circumstances would reasonably be induced to believe that the merchandise had been stolen."). The statute prohibits the act of acquiring the stolen goods, or "bring[ing] about a transfer of interest or possession"—not the continuing possession of them afterward. *People v. Walton*, 990 N.E.2d 861, 869 (Ill. App. Ct. 2013) ("[S]ubsection (a)(4) proscribes only the initial act by which a defendant first gains control of the property.").[7] So, in order for Tenorio's

---

[7]It is worth noting that another part of the same Illinois statute criminalizes "*knowingly* obtain[ing] or exert[ing] unauthorized control over property of the owner." 720 ILCS 5/16-1(a)(1) (emphasis added) (call it "possession of stolen property"). That sub-section sets out a "continuing crime … continuously violated by a person who maintains

arrest to have been reasonable under this theory, the officers were required to have probable cause to believe that the circumstances of Tenorio's purchase of the tires were suspicious enough that an ordinary person would know that they were likely stolen.

Even viewing the evidence in Tenorio's favor, a reasonable jury would have to find that Harris and Upshaw had probable cause to believe that the rims in Tenorio's shop were stolen. In Harris's first conversation with Ziadah (after Ziadah's original complaint, but before he called in about Tenorio's shop in particular), Ziadah reported that the rims were custom painted. Harris Dep. Tr. at 57:13-20. He also "provided pictures … from his cellphone with the rims on a truck that they were on." *Id.* at 57:3-9.[8] So by the time Harris arrived at Tenorio's shop on May 26, 2015 he had already

---

unauthorized possession over property that she does not own." *Walton*, 990 N.E.2d at 869. In their briefing, the Defendants mention 720 ILCS 5/16-1(a)(1). Defs. Mot. Summ. J. at 7. But "knowingly" is a stricter *mens rea* element, requiring that and requires that the person be "consciously aware" of the requisite circumstances. 720 ILCS 5/4-5(1). So the Court will not evaluate whether the officers had probable cause to believe Tenorio was *knowingly* in possession of stolen property. Instead, the only crime that needs to be analyzed is receipt of stolen property, that is, whether Tenorio received the tires under "circumstances [that] would reasonably induce … her to believe that the property was stolen." 720 ILCS 5/16-1(a)(4).

This brings up a factual issue about how Tenorio came into possession of the tires: Tenorio has testified that she did not personally handle the purchase of the tires from the seller. Instead, her secretary conducted it. Tenorio Dep. Tr. at 7:7-10 ("[M]y secretary is the one that made the purchase."); *id.* at 8:18-24 ("Well, I didn't see the rims since I was attending to other customers, but the secretary told me just go ahead and pay the man $800 since we got their information."); *id.* at 9:16-19 ("Well, I did notice the rims afterwards and I did notice they were expensive and she was explaining to me that the man needed the money and so we were able to buy them."). Tenorio might not have seen the tires—or suspected their true value—until *after* the transaction was complete. For the purposes of evaluating probable cause, however, exactly when Tenorio first saw the tires (before or after paying for them) is not particularly relevant. Based on the officers' conversations with Tenorio as the manager of the shop, it was reasonable for them to believe she had participated in the transaction or, at the least, knew the information on the receipt that she provided (which reflected the $800 purchase price).

[8]Tenorio objects that Ziadah's statements are "inadmissible hearsay" for the purposes of summary judgment. Pl. Resp. DSOF ¶ 17. It is true that summary judgment may only be

seen a photograph of Ziadah's rims and believed that they were custom-painted, suggesting that the rims at the shop were unlikely to be some other set of rims. *Id.* at 57:21-23. To be sure, it is unclear exactly how Ziadah knew the rims were at Tenorio's shop. *Id.* at 54:20-55:2 (Harris testifying, "I can't recall exactly. He said that it was either he, himself, or someone noticed the rims resembling his at the shop."); *see also* Pl. Resp. DSOF ¶ 20. But that gap in knowledge became far less relevant at the moment Harris walked into the tire shop and thought he saw a tire rim on display that exactly matched the tire rims in Ziadah's photos. Harris Dep. Tr. at 54:15-19. So Harris reasonably believed that the rims at Tenorio's shop were the ones that had been stolen from Ziadah.

It is a close call, but based on the undisputed facts, the officers also had probable cause to believe that Tenorio bought the tires under circumstances that should have reasonably tipped her off that they were stolen. Most significantly, Harris and Upshaw knew that Tenorio had purchased the tires for far less than the estimated value; remember, Ziadah had reported that he valued the rims at around $10,000 in total. Pl. Resp. DSOF ¶ 14 (citing Harris Dep. Tr. at 49:18-20).[9] And, before

---

based on evidence that would be admissible at trial. *Wragg v. Village of Thornton,* 604 F.3d 464, 466 (7th Cir. 2010). But Ziadah's reports to Harris or other officers are not hearsay. Instead of being offered for their truth, they are offered to establish what Harris and Upshaw knew at the time they arrested Tenorio. *See Cairel v. Alderden*, 821 F.3d 823, 830–31 (7th Cir. 2016) (finding that victims' statements could be considered at summary judgment because they "were offered instead to show the officers had information giving them probable cause to arrest plaintiffs"). Also, as discussed above, probable cause may be based on a statement of a witness or victim. *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009).

[9]It was reasonable for Harris to take Ziadah at his word as to the value of the rims. Ziadah had no particular reason to lie, and although his initial complaint included mistakes about the number and color of rims that were stolen, his credibility was bolstered by the fact that he clarified the mistake in a separate conversation with Harris that took place *before* he reported that the rims were at Tenorio's shop. *See* Harris Dep. Tr. at 95:23-96:4 (testifying

the arrest, Tenorio informed Harris and Upshaw that she had purchased the rims for $800: according to Harris (and not disputed by Tenorio), during Harris's first visit to the shop, Tenorio showed him the record that she had kept from the purchase. Harris Dep. Tr. at 61:18-23, 64:1-4 (acknowledging that Tenorio's record included a copy of the seller's driver's license, and the amount that Tenorio paid for the tires); *see also* Tenorio Dep. Tr. at 15:14-22 (stating that she usually keeps "information on the purchase … on the copy of the I.D. that we keep."); Defs. Resp. Pl. Statement Add. Facts ¶ 21 (stating that Tenorio provided Harris with a copy of the purchaser's ID the first time he visited the shop). The difference between the tires' value (according to Ziadah) and the extremely low price at which Tenorio purchased them established probable cause that, at the least, the steep discount should have reasonably induced Tenorio to believe that the tires were stolen—which is all that the crime requires. 720 ILCS 5/16-1(a)(4).[10]

Tenorio argues that Harris has acknowledged that he had no "information tending to indicate that [Tenorio] *knew* that what she was buying were stolen goods." Harris Dep. Tr. at 64:19-22 (emphasis added); R. 33, Pl. Resp. Br. at 5; *see also* Defs. Resp. Pl. Statement Add. Facts ¶ 23. But Harris's *subjective* assessment does not

---

that Ziadah's first report was filed in August 2014); *id.* at 96:5-21 (testifying that Ziadah made the corrections in a second conversation sometime between August 2014 and May 26, 2015). And again, Ziadah's valuation of the rims is not hearsay because it is not offered for its truth, but rather for what facts Harris knew at the time of the arrest.

[10] Indeed, Tenorio herself later acknowledged that she believed the rims were worth $1,000 each, or $4,000 in total. Tenorio Dep. Tr. at 16:12-15, 19:4-6. Given that she usually only expects to make around $100 in profit on the used rims she buys, Tenorio Dep. Tr. at 32:14-18, the fact that she anticipated making $800 on *each* of the four rims further supports the defense's view that the price differential was a reliable basis for probable cause.

control: the analysis is objective, measured from the standpoint of a reasonable officer. Also, *knowledge* that the property was stolen is not required by Illinois law. All that a reasonable officer needed was probable cause to believe that the circumstances should have reasonably induced a belief in Tenorio that the rims were stolen. Here, the stark price differential—$10,000 versus $800—supplied probable cause. It is a close question, and no doubt some other police officers would have exercised discretion not to effectuate an arrest. Ultimately, however, probable cause does not require even a preponderance of evidence, and given the price difference the officers were aware of, no reasonable jury could find for Tenorio on this issue.

## 2. Qualified Immunity

In arguing for summary judgment, the Defendants did not rely on qualified immunity. It is worth discussing qualified immunity, however, because even if there was a genuine dispute on probable cause—as a straight merits question—the closeness of the question would hand the officers a victory on qualified immunity. To be sure, the Court is not granting summary judgment on the qualified-immunity ground, because the officers did not argue it. But Harris and Upshaw did plead the defense of qualified immunity in their Answer. R. 18, Answer at 7. So they would be entitled to invoke qualified immunity at *trial* via a Rule 50(a) motion for judgment as a matter of law. The parties and the Court would have prepared for trial, brought a venire for jury selection, presented evidence in Tenorio's case-in-chief to a jury—only to then address qualified immunity. So it is worth discussing it now.

Police officers "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Wesby*, 138 S. Ct. at 589 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)) (cleaned up). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). The analysis asks whether the *specific* conduct at issue violates clearly established law, and courts must not define prior law at "a high level of generality." *Id.* (quoting *al–Kidd*, 563 U.S. at 742).

Here, even if probable cause were absent, based on the steep price differential between Ziadah's estimate of $10,000 and the $800 Tenorio paid, reasonable officers would not *know* that they did not have probable cause to make the arrest for theft. Because probable cause is a fact-intensive inquiry, it is not surprising that there is no similar case (though an exact match is not needed) that would put the officers on notice of the alleged lack of probable cause. There is no clearly established law requiring *more* proof of Tenorio's having received stolen property than what the officers had. In any event, as discussed earlier, summary judgment is granted on the lack of probable cause, and not on qualified immunity at this stage of the case.

## IV. Conclusion

Harris and Upshaw's motion for summary judgment is granted. The officers had probable cause to arrest Tenorio for receiving stolen property. The status hearing of April 19, 2019 is vacated. Final judgment will be entered.

ENTERED:


      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge


DATE: March 27, 2019